

**SO ORDERED.**

**SIGNED this 19 day of July, 2010.**

_____
**ROBERT E. NUGENT**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

**PUBLISHED**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| ERIK J. SANDBERG and | ) | |
| SHERRY M. SANDBERG, | ) | Case No. 09-13367 |
| | ) | Chapter 13 |
| Debtors | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

This case requires the Court to bridge the gap between the old, the good faith requirement

of 11 U.S.C. § 1325(a)(3) and the new, BAPCPA's disposable income mandate found in §

1325(b)(1)(B). When is a debtor who has complied with the disposable income requirement barred

from confirmation for lack of good faith?

These above-median income debtors filed a chapter 13 plan in which they propose to repay

several secured claims in addition to their home mortgage. Mr. Sandberg has been unemployed for

nearly 16 months, but Mrs. Sandberg's employment yields sufficient income to render these debtors

-1-

"above-median." The Sandbergs' plan proposes a dividend that only pays the unsecured creditors about $3,000, or some 2.3 per cent of the $125,000 in claims. According to their Form B22C, they have negative disposable income, but their Schedules I and J indicate a surplus of income over expense. The chapter 13 trustee alleges that the debtors did not propose their plan in good faith because the Sandbergs seek to retain and pay for a 36-foot cabin cruiser and Mr. Sandberg's tools formerly used in his work as an aircraft mechanic and these payments significantly reduce the available funds for the unsecured creditors' dividend.

Following an evidentiary hearing on May 25, 2010, at which Mr. and Mrs. Sandberg testified and various exhibits were admitted, the Court makes the following findings of fact and conclusions of law.[1]

Facts

The debtors filed this case on October 14, 2009. Their story is a familiar one in this Division and these times. Mr. Sandberg is 34 years old, holds a General Equivalency Diploma, and has worked since age 15 as a mechanic in various jobs. Over the past ten years, he, like many debtors in this Court, has worked in aircraft manufacturing in Wichita. Most recently, he worked as an installer at Cessna where he was compensated at $23 per hour. He was laid off in April of 2009, about seven months before filing this case, and has been on unemployment compensation of $436 per week ever since. Despite seeking other work in this area, he has remained unemployed. He testified that his only prospects for employment include possibly working at another aircraft

---

[1] Confirmation of a chapter 13 plan is a core proceeding over which this Court has subject matter jurisdiction. *See* 28 U.S.C. § 157(b)(1), (b)(2)(L) and § 1334(b). Attorney David Lund appeared on behalf of debtors. Attorney Christopher Micale appeared on behalf of the chapter 13 trustee, Laurie B. Williams.

Case 09-13367   Doc# 48   Filed 07/19/10   Page 2 of 19

manufacturer as a mechanic for approximately $14 per hour or doing part-time warehouse labor for $8 per hour. Assuming a 40-hour work week, unemployment pays Mr. Sandberg some $10.90 per hour, more than he would make as a warehouseman and only a little less than he could expect in the "new world" of the local aircraft job market. He testified that his unemployment benefits were just recently extended another 13 weeks (to the end of August, 2010) and did not know if he would receive unemployment compensation beyond that.

Mrs. Sandberg is a licensed occupational therapist. She has been continuously employed for several years and has been in her current job for 10 months. Her monthly gross pay is $5,280. Over a 40-hour week, she earns more than $30 per hour. She testified that the market for occupational therapists is strong and that she routinely receives inquiries about other available positions. It is her income that prods the couple above the median income for Kansas.

### The Debtors' Tools and Boat

The Sandbergs have five secured debts to repay under their chapter 13 plan. They were current on their home mortgage at the petition date and therefore do not intend to make conduit plan payments on their home mortgage. They seek to retain a 2001 Yukon worth $8,500 that is secured to Central Star Credit Union and a 2001 Ford F250 pickup worth $11,000 that is secured to Cessna Employees Credit Union. Both were apparently acquired by the debtors more than 910 days before the filing date and both liens may be crammed down. No one has objected to the treatment of these three items. The Trustee bases her lack of good faith objection on the debtors' proposal to retain and pay for Mr. Sandberg's mechanics tools and the couple's boat, a 36-foot Regal Commodore cabin cruiser. The tools secure Mr. Sandberg's debt to Snap-On Tools Credit and are valued at $5,000. The boat is valued by the debtors at $20,000 and subject to a purchase money security

-3-

interest of Central Star Credit Union. The Trustee's appraiser found that the boat was worth $19,991. The debtors also owe Butler County nearly $1,000 in ad valorem taxes and interest on the boat. These back taxes are dealt with in the plan as well.

Mr. Sandberg testified that he wants to retain his tools against the possibility that he will return to aircraft mechanical work. Most aircraft employers require their workers to acquire and own their own tools. He also says he needs the tools to work on the boat. According to Sandberg, were he to purchase new tools, he would incur costs upwards of $20,000. He currently owes Snap-On $13,000.

The Sandbergs bought the boat with a loan from Central Star in 2007. Central Star is presently owed $48,065 on the boat. Mr. Sandberg grew up on a lake and has had numerous boats. He acquired the boat from a dealership in Galveston, Texas, and paid $4,600 to have it trucked to El Dorado Lake, east of Wichita. He bought the boat "as-is" at a steep discount because it needed many repairs. One of the two engines does not function and other repairs are required. According to the Trustee's appraiser, this boat needs over $24,409 worth of repairs, both parts and labor. The boat remains moored at an El Dorado Lake marina and is the focal point of the family's social life. The family "hangs out" there during warm weather and spends time with friends and others on the dock and on the lake.

Schedule J contains no provision in the debtors' expenses for the boat repairs, slip rental, operating expenses or taxes. Mr. Sandberg explained that when the family and their friends use the boat, all contribute food, gas money, and the like to the excursions. If they are short money to run the boat, they simply sit in the dock and socialize. If they need parts for the boat, they swap parts with other boaters at El Dorado Lake. Slip rent amounts to $2,076 per year. The Sandbergs are

behind on their slip rent, having paid only $200 toward slip rental in 2010, but the marina owner has allowed them some grace due to Mr. Sandberg's unemployment. Their Schedule J posits $50 per month in personal property tax, but this falls short of the 2008 taxes of $906 shown on the Butler County rendition filed with its proof of claim.[2] Mr. Sandberg explains that no repair expenses are shown on Schedule J as he intends to do the work himself and he can defer the repairs for a time.

The debtors say that until credit card creditors began aggressive collection efforts against them and the minimum monthly payments increased, the boat payment was affordable. Mr. Sandberg indicated that he did not know about all of the credit card debt because it was in Mrs. Sandberg's name. While the schedules indicate that nearly all of the unsecured credit card debt is joint, a review of the proofs of claim shows that all of the credit card accounts were in Mrs. Sandberg's name. The unsecured debt consists of a scheduled $48,000 student loan for Mrs. Sandberg and approximately $78,000 in credit card debt, nearly all of which was incurred by Mrs. Sandberg. Mr. Sandberg stated that the presence of this debt stressed the Sandbergs' marriage and that the debtors were briefly separated. He says that retaining the boat is one way to "keep the family together."

<u>The Plan</u>

The debtors' plan provides for 60 monthly payments of $1,100 which is equal to the monthly net income as shown on Schedule I and J. The Trustee calculates that, after attorneys fees and trustees fees are paid, and after payments on their secured obligations, the debtors will only return about $2,908 to their unsecured creditors who hold filed claims totaling more than $124,000. The

---

[2] The personal property taxes shown on Schedule J are more likely on the debtors' two vehicles.

-5-

debtors' Form B22C reflects that, after deductions for future secured debt payments on Line 47 (including the $396 payment for the boat), the debtors have negative monthly disposable income on Line 59 in the amount of -$528.98. Even without the boat payment deduction, their Line 59 disposable income would still be negative.

Analysis

The debtors have the burden to prove by a preponderance of the evidence that their plan meets all of the requirements of § 1325, including that it was proposed in good faith.[3] The Trustee concedes that the plan as filed conforms with the disposable income treatment mandated by § 1325(b)(1)(B), (b)(2) and (b)(3). Because the Sandbergs are above the median, they need only pay their unsecured creditors their Form B22C Line 59 disposable income which is, in this case, less than zero. Even if they surrendered the boat, their Line 59 disposable income would still be negative. The debtors argue that paying something more than zero demonstrates their good faith. They also argue that the *Flygare* good faith factors should not be applied where the debtors have met the § 1325(b)(1)(B) disposable income requirements.

Whether to allow the debtors to retain the boat is not the issue. Instead, the Court must determine whether the plan that includes retaining the boat has in fact been proposed in good faith as is required by § 1325(a)(3). The Court makes little of the trustee's objection to Mr. Sandberg's retaining his tools. He is a mechanic and these are mechanic's tools that he will need if and when he returns to regular employment. Based on the fact that these tools are only worth $5,000 and secure a $13,000 claim, the Court suspects that retaining these tools at their depreciated value is a more sound business decision than purchasing new ones in the future at retail, and likely again on

---

[3] *In re Alexander,* 363 B.R. 917, 921-22 (10th Cir. BAP 2007).

Case 09-13367   Doc# 48   Filed 07/19/10   Page 6 of 19

credit.

While a mechanic needs tools, hardly anyone (at least in Kansas) "needs" a recreational boat.

This Court would certainly not counsel anyone in the Sandbergs' financial predicament to keep a

$20,000 boat, but that is, to some extent, a value judgement and a business decision. What the Court

must focus on here is (1) the scope of the § 1325(a)(3) good faith test in the wake of BAPCPA; and

(2) whether retaining the non-essential boat and depriving the unsecured creditors of a more

significant dividend runs afoul of what remains of § 1325(a)(3).

In *Flygare v. Boulden*, the Tenth Circuit enumerated eleven non-exclusive factors that courts

are to consider when determining if a debtor's chapter 13 plan has been proposed in good faith.[4]

While this approach has been criticized by treatise-writers[5] and at least one other Court of Appeals,[6]

it remains the controlling precedent in this District.[7] The *Flygare* factors for determining whether

debtors' plan is proposed in good faith are as follows:

(1) the amount of the proposed payments and the amount of the debtor's surplus;
(2) the debtor's employment history, ability to earn and likelihood of future increases in income;
(3) the probable or expected duration of the plan;
(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
(5) the extent of preferential treatment between classes of creditors;

---

[4] 709 F.2d 1344, 1347-48 (10th Cir. 1983), adopting a factors approach espoused by *United States v. Estus (In re Estus)*, 695 F.2d 311 (8th Cir. 1982).

[5] Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 177.1 at ¶ 4, Sec. Rev. July 23, 2004, and § 197.1 at ¶ 3, Sec. Rev. June 7, 2004, www.Ch13online.com.

[6] *See Keach v. Boyajian (In re Keach)*, 243 B.R. 851, 868-71 (1st Cir. BAP 2000)(Courts analyze debtor's honesty in fact in applying the lack of good faith standard).

[7] *See In re Martin,* 373 B.R. 731 (Bankr. D. Utah 2007) (Applying *Flygare* good faith factors in post-BAPCPA case).

-7-

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief . . .;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee.[8]

Do the economic components of *Flygare's* good faith analysis have continued validity in light of the disposable income test of § 1325(b)(1)(B) as enacted by BAPCPA, and if so, what weight should be given to them?[9] Factors 1 (payment and surplus amounts), 3 (plan duration), and 4 (percentage repayment of unsecured debt) have an economic component that is subsumed by § 1325(b)(1)(B), which now statutorily determines the amount that must be paid to unsecured creditors and the length of the plan.[10] Especially in the case of above-median income debtors, much of a bankruptcy court's discretion in determining whether a debtor's plan may be confirmed has been

---

[8] 709 F.2d at 1347-48 (quoting *Estus,* 695 F.2d at 317).

[9] *See* Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4ᵀᴴ EDITION, § 496.2, Sec. Rev. Apr. 21, 2010, www.Ch13online.com

[10] *See* Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4ᵀᴴ EDITION, § 193.1, Sec. Rev. June 7, 2004, www.Ch13online.com (discussing the disposable income test of § 1325(b), one of four economic tests a debtor must meet for confirmation of a chapter 13 plan, and suggesting that economic-type factors have no place in the good-faith requirement of § 1325(a)(3)); *In re Barr,* 341 B.R. 181 (Bankr. M.D.N.C. 2006) (BAPCPA's adoption of the disposable income test in § 1325(b) had narrowed the focus for determining good faith under § 1325(a)(3) because the good faith factors related to the debtor's ability to pay have been subsumed by the ability to pay test adopted by § 1325(b)); *In re James,* 379 B.R. 903 (Bankr. D. Neb. 2007) (Above-median income debtors' ability to pay is subsumed in projected disposable income requirement of § 1325(b)(3) and § 1325(b)(1)(B), not in good faith confirmation requirement; a debtor does not fail the good faith test simply because of the ability to pay more than the means test result.); *In re Austin*, 372 B.R. 668 (Bankr. D. Vt. 2007) (As long as debtors satisfied projected disposable income test, their ability to pay greater dividend to unsecured creditors based on their actual income and expenses, was not proper basis for challenging debtors' good faith in proposing plan.).

-8-

eliminated.[11]   At the same time, Congress retained § 1325(a)(3)'s good faith requirement for

confirmation without modification.  The Court first considers how to apply the good faith test in this

case, where debtors have complied with the economic tests for confirmation but seek to retain and

pay for a luxury item.  Then it  addresses the continued vitality of the good faith test in the post-

BAPCPA environment.

        We begin with the application of the *Flygare* factors to the facts of this case.   Applying the

first factor, "the amount of the proposed payments and the amount of the debtor's surplus," the

debtors have a Schedule I and J surplus of $1,100, nearly $400 of which is devoted to the boat

payment.  As noted above, their Form B22C monthly disposable income calculated according to the

formula of § 1325(b)(1)(B) and (b)(3) is negative and would remain so, even if the boat payment

were backed out.[12]   The size of the proposed monthly payment is favorable.  The secured debt

payment on the boat is permitted on their Form B22C, Line 47 by § 1325(b)(3) and §

707(b)(2)(A)(iii).   Nevertheless, devoting nearly 40 percent of the debtors' surplus to what is

indisputably a luxury item weighs against the debtors.

        The debtors' employment history and likelihood of further increases in compensation is

uncertain at best. The record is clear that Mrs. Sandberg has a sought-after skill and enjoys job

stability.  Mr. Sandberg is currently a victim of the aviation industry downturn in this community,

---

[11] The disposable income test for above-median income debtors and the manner in which disposable income is calculated is specified in § 1325(b)(2) and (3). Section 1325(b)(4)(A) determines the length of the applicable commitment period (3 years or 5 years).

[12]  Line 59 of Form B22C reflects monthly disposable income of <$525>.  If the $400 secured debt payment on the boat is not deducted on Line 47, debtors' monthly disposable income is still a negative <$125>.  The parties agree that the secured debt payment on the boat is a permissible deduction under § 707(b)(2)(A)(iii) and § 1325(b)(3).

but he also has considerable manual skills that should gain him employment in what has classically

been a cyclical industry. The debtors' combined income may well increase during the life of the

plan if Mr. Sandberg secures an aviation job. At the same time, if Mr. Sandberg cannot find a job

at the income level he enjoyed prior to his layoff, his current income level may remain the same or

even decline when his unemployment compensation runs out. Mr. Sandberg had no firm job

prospects as of the time of the hearing. This factor weighs against the debtors.

The debtors have proposed a 60-month plan, consistent with their applicable commitment

period as determined by § 1325(b)(4)(A)(ii). This factor weighs in their favor.

There are inaccuracies and omissions in the debtors' schedules, but only with respect to the

anticipated costs of maintaining, operating and docking the boat. The debtors testified that they

believe these costs will be offset by the contributions of their fellow mariners but the Court is

frankly dubious. Nor is the Court convinced that this charity will last the life of the plan. These

omissions were not made in an effort to mislead; instead the Court believes they betoken the

debtors' failure to understand the depth of their financial problems and deal with reality. This factor

weighs against debtors.

Turning to preferential treatment between classes of debt, the debtors propose a 2.285%

repayment, or about $2,900, of the approximate $127,000 of unsecured debt.[13] This satisfies the

disposable income test as calculated under § 1325(b)(1)(B), (b)(2) and (b)(3) because debtors' Form

B22C, Line 59, produces a negative monthly disposable income figure of <$525>.[14] The bulk of the

---

[13] Ex. C.

[14] Ex. A, p. 30.

plan payments will pay secured claims of $47,000, of which nearly $20,000 is the boat claim.[15] By

choosing to pay for the boat at the expense of the unsecured creditors, the debtors have preferred the

boat claim over the unsecured class. This weighs against the debtors.

All of the debtors' claims that are secured by personal property are modified in some way,

but not in an improper, illegal, or inconsistent way. Chapter 13 permits debtors here to cram down

the $56,000 debt secured by the boat, to $19,991, its value as determined by the trustee's appraiser.

If debtors were in a chapter 7, they would likely be required to pay the full amount of the debt (by

reaffirmation) in order to retain the boat. This factor weighs neutral.

Nothing the debtors have proposed in the plan affects the dischargeability of any of their

debts, though the Court notes that Mrs. Sandberg's $48,000 student loan debt will not be discharged.

In light of the provisions of § 707(b), the debtors likely do not have chapter 7 relief available to

them. This factor weighs neutral.

There are no medical expenses or other special circumstances to consider. Nearly all of

debtors' unsecured debt is comprised of Mrs. Sandberg's student loan and credit card debt. The lack

of special circumstances weighs against the debtors.

This is the debtors' first (and hopefully last) bankruptcy case. This factor weighs in favor

of debtors.

The plan places no additional or untoward administrative burden on the Trustee.[16] This

---

[15] Ex. C.

[16] The trustee suggests that her necessity to monitor Mr. Sandberg's employment to determine whether the plan should be modified under § 1329 in the event he secures employment and their monthly disposable income increases is an additional burden on her and may set a precedent in other cases. *See* Dkt. 46, p. 10. As the trustee indicates in her brief, this can be remedied with a plan provision to account for those potential increases.

-11-

factor weighs in favor of debtors.

This leaves the final factor, motivation and sincerity. Nothing in the debtors' appearance and demeanor suggests they are personally insincere or dishonest. Yet they doggedly insist on retaining an asset that, by all indications, they can neither afford to maintain nor operate, leaving the sincerity of their purpose in financially rehabilitating themselves in question. The Sandbergs are behind on both their slip rent and property taxes, and even though they have been shielded from creditor collection efforts since filing this case, they still must rely upon friends and others to furnish the means to operate the boat. Even without evidence, the Court can intuit that supplying gas and oil to regularly operate a 36-foot cabin cruiser is likely to cost in excess of the $500 per month the Sandbergs project as transportation expense or the $50 they designate as recreational expense. The idea that the debtors would retain a boat they cannot afford to maintain or operate solely for use as a gathering place would make little sense if they were not in bankruptcy. That they seek to do this at the expense of their credit card creditors while deferring repayment of a $48,000 nondischargeable student loan demonstrates that they have placed their own recreational desires ahead of the legitimate claims of their unsecured creditors. This belies their assertion that they are motivated and sincere in their efforts at financial rehabilitation. This factor weighs heavily against them.

Many courts have considered plans in which debtors seek to retain and pay for a luxury item, diverting income that would otherwise be available to pay unsecured creditors.[17] Luxury goods are goods that are not reasonably necessary for the support or maintenance of the debtor or debtor's

---

[17] The *Flygare* list of factors relevant to determining good faith "is not exhaustive." *Flygare, supra* at 1348.

dependents.[18]  The Court has no doubt that the debtors' 36-foot cabin cruiser is a luxury good.

Section 1325(a)(3) does not expressly speak to luxury goods as part of the good faith inquiry, but

the courts have repeatedly considered retention of luxury goods under the good faith test for

confirmation.  A primary purpose of the good faith inquiry is to determine under the totality of the

circumstances of a case whether there has been an abuse of the provisions, purpose, or spirit of

Chapter 13.[19]  This inquiry often comes down to a question of fundamental fairness.[20]

A preponderance of the *Flygare* factors weigh against the debtors.  Even if the Court

discounts or disregards the economic factors entirely because the debtors have complied with the

statutory disposable income test as calculated by § 1325(b)(1)(B), (b)(2) and (b)(3), the non-

economic factors, particularly motivation and sincerity, compel the conclusion that their plan is not

proposed in good faith.[21]

Having applied the *Flygare* factors and found a lack of good faith, the Court now considers

whether compliance with § 1325(b)(1)(B) disposable income requirements somehow negates that

finding.  Many other courts have denied confirmation for lack of good faith in like circumstances,

even though the proposed distribution to unsecured creditors satisfies the § 1325(b) projected

disposable income test.  These courts generally reason that the good faith inquiry in § 1325(a)(3)

---

[18]  In the context of § 523(a)(2)(C)'s discharge exception, "luxury goods and services" are goods or services that are not reasonably necessary for the support or maintenance of the debtor or debtor's dependents. *See* § 523(a)(2)(C)(ii)(II).  "Luxury" is defined as "something adding to pleasure or comfort but not absolutely necessary." *See* http://www.merriam-webster.com/dictionary/luxury.

[19]  *See In re Hylton,* 374 B.R. 579, 586 (Bankr. W.D. Va. 2007).

[20]  *Matter of Love,* 957 F.2d 1350, 1357 (7th Cir. 1992).

[21]  *See Flygare, supra* at 1348 ("[T]he weight given each factor will necessarily vary with the facts and circumstances of each case.").

-13-

is distinct and separate from the projected disposable income requirement of § 1325(b).[22]  In *In re Hylton,* the bankruptcy court acknowledged that while a debtor is entitled to take a deduction for secured debt payments on a luxury item (boat) for calculating disposable income, a plan that proposes to retain the boat is still subject to the good faith requirement of § 1325(a)(3) for confirmation.

> Notwithstanding the fact that the Debtors are entitled to account for the boat payments when calculating their disposable income under the means test, confirmation of a plan proposing to retain the boat is subject to the good faith test under 11 U.S.C. § 1325(a)(3). . . . [A] court's inquiry into whether a Chapter 13 plan has been proposed in good faith is governed by a totality of circumstances inquiry.
>
> * * *
>
> Courts have denied confirmation of Chapter 13 plans that propose to pay for nonessential or luxury, secured assets. . . . While an above-median debtor who proposes to retain a . . . luxury asset may not be doing so at the expense of unsecured creditors post-BAPCPA, because the return to general unsecured creditors under a Chapter 13 plan is guided by the means test, such a conclusion does not make this court any less mindful of the fact that "the good faith inquiry is intended to prevent abuse of the provisions, purpose, or spirit of Chapter 13." [citation omitted] As such, this court concludes that the Debtors' proposal to retain their boat, which is used solely for recreational purposes, is subject to the Bankruptcy Code's good faith test.[23]

Similarly, the Utah Bankruptcy Court stated in *In re Martin*:

---

[22]  *See In re Martin,* 373 B.R. 731, 735-36 (Bankr. D. Utah 2007) (ski boat); *In re Hylton*, 374 B.R. 579, 586 (Bankr. W.D. Va. 2007) (recreational boat); *In re Owsley,* 384 B.R. 739, 750 (Bankr. N.D. Tex. 2008) (Compliance with § 1325(b)(3) and § 707(b)(2)(A) is not dispositive of good faith because good faith embraces more than just lawful compliance with those sections; good faith is assessed in the context of the totality of the circumstances); *In re Shafer,* 393 B.R. 655, 663, 661 (Bankr. W.D. Wis. 2008) (BAPCPA's amended definition of disposable income does not alter application of good faith totality of circumstances test.); *In re Devilliers*, 358 B.R. 849, 867 (Bankr. E.D. La. 2007) (Technical compliance with the means test does not necessarily satisfy debtor's burden of showing good faith but court concedes it should be the "rare" debtor whose plan complies with § 1325(b) but cannot meet the good faith standard.)

[23]  374 B.R. at 586.

-14-

Simply because an item is an allowable expense on Form B22C does not shelter it from scrutiny under the Court's good faith analysis. Section 1325(a)(3), which requires the Court to find that a plan is proposed in good faith, is distinct and independent from the requirements of § 1325(b), which requires debtors to comply with Form B22C. To confirm a plan the Court must find that a debtor complies with both provisions.[24]

Similar to the instant case, the debtors in *Martin* proposed a chapter 13 plan in which they would retain a Cobalt ski boat and trailer. They deducted on Line 47 of Form B22C the $302 monthly secured debt payment owed on the boat to the secured creditor for which a total of $21,350 was owed. The debtors proposed to pay a priority unsecured debt, a $26,000 mortgage arrearage, and $500 unsecured debt through the plan. They proposed to pay their secured debts, including the ski boat, outside the plan.[25] The bankruptcy court concluded that under the totality of the circumstances, debtors' plan did not pass the "smell test," and could not be confirmed.[26]

Other courts have reached a similar conclusion when faced with debtors' who seek to retain and pay for luxury items.[27] In *In re Cordle*, the bankruptcy court sided with the chapter 13 trustee, who objected to confirmation of debtors' plan as not being proposed in good faith where debtors proposed to pay $31,000 to secured creditor of a boat and trailer while paying little to unsecured

---

[24] *Id.* at 736.

[25] It is not clear in *Martin* whether Form B22C yielded a negative disposable income figure as in the case at bar. Nor is the amount of unsecured debt revealed, although a paltry $500 was proposed to be paid to unsecured creditors. Unlike *Martin,* the debtors here propose to pay for their boat through the plan. That $400 boat payment is a large portion of the $1,100 plan payment that would otherwise be available for unsecured creditors if debtors surrendered the boat.

[26] *Martin, supra* at 735-36 where the bankruptcy court described the totality of circumstances as a "smell test" and concluded: "It seems fundamentally inappropriate that a debtor might file for bankruptcy relief and obtain a discharge of debt while still enjoying a luxury item such as a recreational ski boat and trailer."

[27] *See In re Cordle,* 2009 WL 762184 (Bankr. D. Neb. Mar. 19, 2009).

creditors. The trustee argued that debtors should surrender the boat and trailer to the secured

creditor and maintain their plan payment at the current level in order to maximize the distribution

to unsecured creditors. The *Cordle* court noted Eighth Circuit precedent that in the final analysis,

good faith should be evaluated on a case-by-case basis in light of the structure and general purpose

of Chapter 13.

> Allowing debtors to retain and pay for expensive recreational assets at the expense of unsecured creditors clearly violates the general purpose of Chapter 13. *See Coop v. Frederickson (In re Frederickson),* 545 F.3d 652, 658 (8th Cir. 2008) (referencing Congress' intent that increased payments will flow from above-median debtors to unsecured creditors). Accordingly, the proposed plan fails to meet the good faith test . . .[28]

One bankruptcy court in this Circuit has gone so far as to state that a debtor's ability to pay may

even be considered in the context of determining whether the plan is proposed in good faith, even

though the plan satisfies the projected disposable income test.[29] In *In re Williams,* the bankruptcy

court noted the "ability to pay" overlap between the good faith and disposable income requirements

that has existed since 1984, when the disposable income test of § 1325(b) was first added to the

Code.

> This apparent overlap between § 1325(a)(3) and § 1325(b) has been a subject of dispute for many years. When § 1325(b) was first added to the Code in 1984, some courts held that its adoption narrowed the focus for determining good faith . . . because the factors related to the debtor's ability to pay previously considered under the totality of the circumstances test were subsumed by the ability-to-pay test adopted in § 1325(b). Other courts, including the Tenth Circuit, continued to consider a debtor's ability to pay as one of many relevant factors in the totality of the circumstances test.[30]

---

[28] 2009 WL 762184 at *1. *See also In re Lilienthal,* 2009 WL 3103735 (Bankr. D. Neb. Sept. 23, 2009)

[29] *In re Williams,* 394 B.R. 550 (Bankr. D. Colo. 2008).

[30] *Id.* at 571-72.

-16-

The *Williams* court went on to adopt what has been termed the "intermediate approach." Section

1325(b)(1)(B) as adopted by BAPCPA will be the primary measure of whether a debtor has

committed sufficient income to the plan. But a debtor's ability to pay is not wholly eliminated from

consideration in § 1325(a)(3)'s good faith analysis which, in this Circuit, necessarily implicates the

*Flygare* factors. The bankruptcy court may still examine the ability to pay and determine whether

the proposed plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13.[31] The

*Williams* court explicitly cited retention and payment of luxury items as a circumstance that may

constitute an abuse of chapter 13:

> For example, a debtor who deducts substantial amounts of secured debt for luxury
> items on Form 22C may technically comply with § 1325(b), but be unable to
> demonstrate that a plan offering only minimal or no payments to unsecured creditors
> was proposed in good faith.[32]

Finally, this Court recognizes that Congress retained § 1325(a)(3)'s good faith requirement

for confirmation when it enacted BAPCPA in 2005 and appended to subsection (b) the more detailed

and objective disposable income test. Congress made no effort to limit the existing case law

concerning the good faith requirement.[33] Two canons of statutory construction compel the

conclusion that good faith remains alive and well as a separate and independent requirement for

confirmation, notwithstanding compliance with the disposable income test. First, when Congress

adopted BAPCPA, it is presumed to have had knowledge of the existing requirements for

---

[31] *Id.* at 572.

[32] *Id.*

[33] The only tweaking of the good faith requirement by BAPCPA was the *addition* of §
1325(a)(7) – an express confirmation requirement that debtor *filed the petition* in good faith. *See
Hamilton v. Lanning,* __ S. Ct. __, 2010 WL 2243704 at *7 (June 7, 2010) (Courts will not read
the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress
intended such a departure; BAPCPA did not amend the term "projected disposable income".).

confirmation, including the interpretations given by the bankruptcy courts to the good faith requirement.[34] Second, interpretation of statutes that render language superfluous are disfavored.[35] If the good faith test were wholly subsumed by the disposable income and other economic tests for confirmation, § 1325(a)(3) would be superfluous and would have been eliminated. It was not. This suggests that the good faith test is not limited by the objective disposable income test. Accordingly, this Court concludes that debtors must meet the good faith test, in addition to satisfaction of the disposable income test in order for their plans to be confirmed. The Sandbergs cannot meet the good faith test.

Conclusion

The Court concludes that it is bound to follow and apply the test of good faith as adopted by *Flygare,* even though the debtor may technically comply with the projected disposable income test of § 1325(b)(1)(B) and (b)(3). Under the *Flygare* totality of circumstance factors, debtors' plan has not been proposed in good faith, notwithstanding the permitted deduction of the secured debt payment on the boat. While several of the factors weigh against debtors, including the ability to pay, the Court finds that the debtors' motivation and sincerity, in particular, is the most damaging factor. As in the *Martin* case, the debtors' plan cannot be confirmed because it is "fundamentally inappropriate" to permit the debtors to discharge so much unsecured debt while still retaining and

---

[34] *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 211, 108 S. Ct. 963, 99 L. Ed. 2d 169 (1988).

[35] *See In re Stephens,* 402 B.R. 1, 6 (10th Cir. BAP, 2009); *In re Lanning,* 545 F.3d 1269, 1279 (10th Cir. 2008), *aff'd Hamilton v. Lanning,* __ S. Ct. __, 2010 WL 2243704 (No. 08-998) (U.S., June 7, 2010); *Kawaauhau v. Geiger*, 523 U.S. 57, 62, 118 S. Ct. 974, 140 L.Ed. 2d 90 (1998) (Courts are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law).

-18-

enjoying a luxury item.  Holding otherwise would defy the letter and spirit of chapter 13.  The

Trustee's good faith objection to confirmation under § 1325(a)(3) should therefore be SUSTAINED.

The debtors are granted 21 days to amend their plan or the case will be dismissed without further

court order.

# # #

Case 09-13367    Doc# 48    Filed 07/19/10    Page 19 of 19